## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

NATHANIEL CLAYBROOKS and
CHRISTOPHER JOHNSON, individually, on
behalf of all others similarly situated,

       Plaintiffs,

       v.

AMERICAN BROADCASTING COMPANIES,
       INC., WARNER HORIZON TELEVISION,
       INC., NEXT ENTERTAINMENT, INC.,
       NZK PRODUCTIONS, INC., and
       MICHAEL FLEISS,

       Defendants.

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs Nathaniel Claybrooks and Christopher Johnson ("Plaintiffs"), on behalf of all others similarly situated, for their complaint against Defendants American Broadcast Companies, Inc. ("ABC"), Warner Horizon Television, Inc. ("Warner"), Next Entertainment, Inc. ("Next"), NZK Productions, Inc. ("NZK"), and Michael Fleiss (collectively "Defendants"), allege, upon personal knowledge as to the allegations concerning themselves and upon information and belief based on investigation of counsel as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This class action seeks redress for the intentional exclusion of people of color from the lead role on ABC's popular television shows *The Bachelor* and *The Bachelorette*.

2.      Central to this action, in the words of the Supreme Court, is a glaring and "inexorable zero."  Never, over 10 years and a combined total of 23 seasons of *The Bachelor* and *The Bachelorette*, has either show ever featured a single person of color—whether African

American, Latino, Asian, or any other minority race or ethnicity—in the central role of the "Bachelor" or "Bachelorette." In 16 seasons of *The Bachelor* and 7 seasons of *The Bachelorette*, every person featured in the lead role on either show has been white.

3.     All applicants of color, including plaintiffs Nathanial Claybrooks and Christopher Johnson, have been denied the same opportunity as their white counterparts to compete for the role of the Bachelor and Bachelorette due to their race and/or color.

4.     This action is brought by Plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all other persons of color who have attempted to contract with Defendants for the role of the Bachelor or Bachelorette but been denied the equal opportunity for selection on the basis of race in violation of 42 U.S.C. § 1981 and California Civil Code §§ 51 and 51.5.

5.     Following the Civil War, pursuant to the Civil Rights Act of 1866, federal law has guaranteed every person within the United States "the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." This longstanding law was intended to give African Americans (many of whom were recently freed from slavery) equal contracting rights as whites. It plainly prohibits whites from refusing to contract with African Americans because of their race. California law provides similar protection.

6.     These laws guarantee equal opportunity to contract in business, commerce, and media regardless of one's skin color. Such equal opportunity is essential for members of all races to participate fully in the nation's economic growth. But the Defendants, including one of the leading broadcasters in the country of the images that shape our views of who we are, have deliberately chosen to deny these rights to persons of color despite well-publicized criticisms of the exclusion of racial minorities from these programs.

2

7.     In addition to violating the law, the deliberate exclusion of people of color from the roles of the Bachelor and Bachelorette underscores the significant barriers that people of color continue to face in media and the broader marketplace.

8.     Moreover, studies show that images presented in the media play a substantial role in the formation of peoples' racial attitudes and opinions.  The absence of Bachelors and Bachelorettes of color suggests, to both white viewers and viewers of color, that interracial or non-white relationships are undesirable or unworthy of the nationally broadcasted platform of *The Bachelor* and *The Bachelorette*.

9.     As a matter of law, defendants cannot justify their exclusion of racial minorities based on the perceived racial biases of members of their television audience or their advertisers.

10.     Plaintiffs seek injunctive relief to stop this exclusion of class members from the leading roles in these shows.  Plaintiffs also seek awards of punitive damages for Defendants' deliberate violations of federal and state law and to deter others from similarly refusing to contract with racial minorities out of fears that their customers might react negatively to the results of treating those minorities fairly and equally.

## JURISDICTION AND VENUE

11.     The court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as to Plaintiffs' claims of discrimination in violation of 42 U.S.C. § 1981 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to Plaintiffs' claims of discrimination in violation of California Civil Code §§ 51 and 51.5.

12.     Venue is proper in this district because Defendants have done and regularly do business in this district, a substantial number of the events that gave rise to Plaintiffs' claims took place in this district, and Plaintiffs reside in this district.

3

## THE PARTIES

13.     Nathaniel Claybrooks is an African American adult male who lives in Nashville, Tennessee.

14.     Mr. Claybrooks is an upstanding member of the Nashville community.  He is a small business owner—he owns a barber shop and an auto detailing business in Nashville—and an investor who helps local businesses get started.  In addition, he regularly testifies on behalf of parolees as an employer who is willing to hire those who are formerly incarcerated.

15.     Mr. Claybrooks attended undergraduate school at Middle Tennessee State University, where he starred on the school's football team as a linebacker.  Mr. Claybrooks was designated All Conference in 1994 and 1995 and All American in 1995.  He also earned Most Valuable Player – Defense while on the team.

16.     Mr. Claybrooks was offered a free-agent contract by the Miami Dolphins after his third year of college.  He instead decided to stay at Middle Tennessee State to finish his degree.  Mr. Claybrooks graduated in 1997, earning a Bachelor of Science in Sports Medicine and minoring in Psychology.

17.     In 1999, Mr. Claybrooks joined the Arena Football League as a linebacker.  He played for the Nashville Kats in 1999 and the Augusta Stallions in 2000.  He then played for Nashville's semi-professional team, the Nashville Storm, from 2001 to 2011.

18.     Christopher Johnson is an African American adult male who lives in Nashville, Tennessee.

19.     Mr. Johnson is currently preparing to try out for teams in the National Football League as a wide receiver.  He also plans to serve his country by enlisting with the Air Force in the near future.

4

20.     Mr. Johnson is an active member of his church and is frequently involved in charitable services in the Nashville community, including feeding the homeless.

21.     In high school, Mr. Johnson was a star football player and one of the best wide receivers in the state of Tennessee.  He was recruited by a number of schools to play collegiate football after high school.

22.     Mr. Johnson chose Tennessee State University, where he starred on the football team and majored in Business Administration and Marketing.  As a wide receiver and one of the team's best players, Mr. Johnson became the third all-time leader in receiving yardage at Tennessee State University.

23.     After graduating from Tennessee State University, Mr. Johnson became a permanent substitute teacher and football coach at J.O. Johnson High School in Hunstville, Alabama before moving back to Nashville to seek full time employment as a teacher.

24.     American Broadcasting Companies, Inc. ("ABC") is a New York corporation with its principal place of business in New York, New York.  ABC also conducts business throughout the state of Tennessee and maintains more than 8 employees in the state.  ABC is a network television company that broadcasts national programming, including *The Bachelor* and *The Bachelorette*.

25.     Next Entertainment, Inc. is a California corporation with its principal place of business in Santa Monica, California.  Next is a television production company involved in the production of *The Bachelor* and *The Bachelorette*.

26.     Warner Horizon Television, Inc. is a California corporation with its principal place of business in Burbank, California.  Warner is a television production company involved in the production of *The Bachelor* and *The Bachelorette*.

5

27.     NZK Productions, Inc. is a California corporation with its principal place of business in Burbank, California.  NZK is a television production company involved in the production of *The Bachelor* and *The Bachelorette*.

28.     Michael Fleiss, a white male, is the President of Next Entertainment, Inc.  He is the creator and primary producer of *The Bachelor* and *The Bachelorette*.

## FACTUAL BACKGROUND ON THE BACHELOR

29.     *The Bachelor*, which debuted on ABC in 2002, is a popular reality television show in which approximately 25 women compete for the affections of a single man – the "Bachelor."  Each season of the show features a different Bachelor and a different pool of women.  There have been 16 seasons of *The Bachelor* since it first aired in 2002.

30.     The show has had as many as 25 million viewers tune into one episode. Combined, *The Bachelor*, *The Bachelorette*, and related enterprises, have generated hundreds of millions of dollars in revenues.

31.     Over the course of each season, the Bachelor eliminates women one-by-one until settling on the woman with which he wants to engage in a monogamous relationship.  In many cases, the Bachelor proposes to the final woman he chooses.

32.     In 2003, *The Bachelorette* debuted as a spin-off of *The Bachelor.*  The two shows are identical except that the gender roles are reversed – a woman occupies the lead role and approximately 25 men compete to be the winner.  There have been a total of 7 seasons of *The Bachelorette* since it first aired in 2003.  The next season is scheduled to start on May 14, 2012.

33.     Upon information and belief, the person selected to be the Bachelor or Bachelorette signs a contract with Defendants setting the contours of their relationship.  The contract is binding on the parties over the course of the particular season.

34.     Upon information and belief, the person selected to be the Bachelor or Bachelorette is paid a stipend for agreeing to be a part of the show.  Their housing, food, and travel expenses are fully paid for by Defendants.  Upon information and belief, the show's producers exercise significant control over the Bachelor's and Bachelorette's conduct and words during filming.

35.     Upon information and belief, persons cast as the Bachelor or Bachelorette continue to enjoy many benefits of being in the lead role after the season is over, including but not limited to financial and professional benefits stemming from newly-acquired "celebrity" status and increased notoriety.

36.     Like all television shows, *The Bachelor's* and *The Bachelorette's* profitability depends on their ability to attract viewers and, by extension, advertisers.  The more viewers there are, the more money Defendants can raise in advertising revenue.

37.     According to ABC's website for *The Bachelor*, "there has been an eclectic mix of bachelors over the years.  We've seen a doctor, football star, prince, millionaire, [and a] single dad."

38.     Despite this "eclectic mix," Defendants' selections for the Bachelor and the Bachelorette have led to an inexorable zero.  Over the course of 23 seasons, not one time has the show's eclectic mix ever included a Bachelor or Bachelorette who is a person of color.  Each of the 23 people who have filled the role of the Bachelor and Bachelorette—despite their apparent professional diversity—have all been white.  Not surprisingly, Emily Maynard, the Bachelorette selected for the show's upcoming eighth season, is white as well.

39.     Not only has every Bachelor and Bachelorette in the shows' 23-season history been white, but nearly all of the "suitors" are white as well.  Females of color are few and far

7

between on *The Bachelor* and, to the extent the show ever does contain non-white female contestants, they tend to be eliminated early on in the show. The same is true of males of color on *The Bachelorette*. The result is an almost all or entirely all white group of contestants featured on the shows every week that they air.

40. The shows' complete lack of people of color is no accident. As illustrated below, and upon information and belief, numerous people of color have applied to be the Bachelor or Bachelorette. These applicants were denied the same opportunity to become the next Bachelor or Bachelorette as white contestants not because they were unsuitable for the role or could not contribute to the show's "eclectic mix," but solely because of the perceived risk that casting a Bachelor or Bachelorette who is a person of color would alienate the show's majority-white viewership. Intentional discrimination, even if based on perceptions of customer bias, is prohibited by Section 1981 and sections 51 and 51.5 of the California Civil Code.

## DEFENDANTS' DISCRIMINATORY CONDUCT

41. Over the course of the 10-year history of *The Bachelor* and *The Bachelorette*, Defendants knowingly, intentionally, and as a matter of corporate policy refused to cast people of color in the role of the Bachelor and Bachelorette.

42. Upon information and belief, Defendants refused to seriously consider applicants of color and instead only cast people in the role of the Bachelor or Bachelorette who they believed would maintain the show's viewership and, by extension, the show's advertising revenue. As the show's 23 Bachelors and Bachelorettes plainly illustrate, this meant only contracting with white applicants.

43. Defendants have long been on notice of public concern that not a single Bachelor or Bachelorette in 23 seasons has been a person of color. The absence of Bachelors and

8

Bachelorettes of color on the two shows has been well-documented and is the subject of frequent commentary. For example, the *Los Angeles Times* has run an article pointing out the all-white cast of Bachelors, as have other online media outlets such as *The Daily Beast*, *The Huffington Post*, and *The Grio*.

44.     The *Los Angeles Times* article stated that "ABC executives maintained two years ago that the show was 'exploring' the possibilities of casting a person of color in the pivotal role." Nevertheless, "insiders said producers had little interest in pursuing a more diverse cast, and were unwilling to vary the chemistry of a hugely popular series and wary of a potential controversy stemming from an interracial romance."

45.     Michael Fleiss, creator of *The Bachelor* and *The Bachelorette* and President of Next, has, on at least one occasion, responded publicly to the outpour of commentary on the show's racial composition. He has stated that the lack of people of color on the show is due to a lack of diverse applicants. Specifically, in an interview with Entertainment Weekly he said: "We always want to cast for ethnic diversity. It's just that for whatever reason, they don't come forward. I wish they would." As the facts related to Mr. Claybrooks and Mr. Johnson clearly illustrate below, those statements are patently untrue, and a pretext for racial discrimination.

46.     In response to Mr. Fleiss's public statement, Shawn Ryan, a well-known television producer, stated: "They blame minorities for 'not coming forward.' What a joke. Straight up racism. They just don't think America will watch black bachelor or root for mixed-race dating." Among other things, Mr. Ryan created the television dramas *The Shield* and *Chicago Code*, both of which have included leading roles played by actors of color.

47.     The exclusion of people of color from *The Bachelor* and *The Bachelorette* has become so extreme that an Oregon resident, Lamar Hurd, has recently embarked on a national

9

campaign to become "the first Black Bachelor."  His efforts have garnered significant national attention since March 30, 2012, including articles in *The Huffington Post*, *Entertainment Weekly*, *BET.com*, and *Essence.com*.  Mr. Hurd's campaign has also been covered on television by local and entertainment news programs.

48.     In casting the roles of the Bachelor and Bachelorette, Defendants solicit mail-in applications via their website and hold casting calls in various locations across the country when looking to select someone for the next season of *The Bachelor* and *The Bachelorette*, including Nashville, Tennessee.

49.     The applications require the applicant to fill in basic information, as well as physical characteristics such as height, weight, hair color, and eye color.  The questionnaire is used for evaluating potential participants and inquires about the applicant's education, family life, past relationships, hobbies, talents, and ideal mate.  The applications also ask, among other things, why the applicant would be a good husband or wife, and why the applicant is "America's Most Eligible" Bachelor or Bachelorette.

50.     In addition to filling out the questionnaire, applicants are also required to send in 5-15 recent photographs, including "close-up shots and full body pics."  Applicants are also encouraged to submit videos of themselves.

51.     Applicants selected as semi-finalists are flown out to Los Angeles for additional interviews.  Semi-finalists must also submit a packet of additional paperwork, including a confidentiality agreement, a general release, a background check authorization form, and a medical history form.

52.     In 2011, Mr. Johnson completed the paper application and questionnaire to become the next Bachelor, and, in compliance with the application's instructions, had professional pictures taken of himself to include with the application.

53.     Shortly after completing the application and questionnaire, Mr. Johnson went to a hotel in the Brentwood/Franklin neighborhood of Nashville, Tennessee where Defendants were holding a casting call.  He went to submit his application in person and complete any other prerequisites—such as an interview—to be considered a candidate for the next Bachelor.

54.     When Mr. Johnson walked into the hotel lobby, he was immediately stopped by one of Defendants' employees who asked why Mr. Johnson was there.  Mr. Johnson stated to the employee, who was white, that he had the necessary materials and had come to apply for *The Bachelor*.  The white employee stated that he would take Mr. Johnson's application materials and be sure to pass them on to the show's casting directors.

55.     As Mr. Johnson handed the white employee his application materials, he noticed several other persons who appeared to be hopeful Bachelor applicants walking past him and the white employee and proceeding into the hotel.  None of the other potential applicants was stopped by any of Defendants' employees.

56.     Mr. Johnson handed the white employee his application and pictures.  The employee did not give Mr. Johnson any further instructions.  Mr. Johnson proceeded to turn around and leave the hotel.  He was never contacted by Defendants regarding his application.

57.     Mr. Johnson's attempt to apply for the Bachelor was cut short by Defendants' employee.  He was denied the same opportunity to become the next Bachelor as other non-black applicants.

11

58. In 2011, Nathaniel Claybrooks went to the Indigo Hotel in downtown Nashville, Tennessee where Defendants were conducting a casting call for *The Bachelor*.

59. When he arrived, he was instructed to fill out the necessary application and questionnaire before being interviewed by Defendants.

60. Several other hopeful applicants filled out applications and sat in the waiting room. Every employee of Defendants at the Indigo Hotel appeared to be white. Mr. Claybrooks waited as the white applicants before him were interviewed. Their interviews took approximately 45 minutes.

61. Mr. Claybrooks was interviewed on camera by one of Defendants' employees, who was white. During the interview, Mr. Claybrooks answered personal questions, including what he likes to do in his free time, whether he goes to church, and whether he has ever been married. At one point during the interview, the interviewer asked Mr. Claybrooks to stand up and conduct a 360 degree turn for the camera so that the interviewer could get a full view of his body.

62. However, Mr. Claybrooks' interview lasted for a much shorter time than the interviews with white applicants who went before him. Mr. Claybrooks felt that he was being rushed through the process and was not given the same opportunity as his white counterparts

63. At the conclusion of the interview, Defendants told Mr. Claybrooks that they would contact him regarding his application. Mr. Claybrooks has not heard from Defendants since.

64. Defendants instead selected Ben Flajnik as the Bachelor for its 2012 season. Mr. Flajnik is white.

12

65.     Both Mr. Johnson and Mr. Claybrooks were well-qualified to become the next Bachelor.  They are outgoing, personable people who are upstanding members of their community.  Upon information and belief, their applications were never seriously considered by Defendants because of their skin color.

66.     As stated above, Defendants have never selected a person of color to be the Bachelor in the show's 10-year history.

67.     The absence of a Bachelor or Bachelorette of color over 23 seasons is not due to a lack of qualified applications from people of color.  Rather, minority applicants are purposefully provided less than an equal opportunity on the basis of race.  Defendants have engaged in an intentional scheme to deny minority applicants the same opportunity to be seriously considered as the next Bachelor or Bachelorette.  Defendants have continued to knowingly and intentionally deny people of color that opportunity despite being aware that the two shows have never featured a person of color in the lead role.

68.     Upon information and belief, by only hiring white applicants, Defendants are making the calculation that minorities in lead roles and interracial dating is unappealing to the shows' audiences.  The refusal to hire minority applicants is a conscious attempt to minimize the risk of alienating their majority-white viewership and the advertisers targeting that viewership.  Nevertheless, such discrimination is impermissible under federal and state law.

69.     Defendants' practice of only casting white persons in the role of the Bachelor and Bachelorette is furthered by Defendants' practice of selecting a person for the lead role from the pool of male suitors that appears on *The Bachelorette* and the pool of female suitors that appears on *The Bachelor*.  According to Michael Fleiss, the show's creator, they are unlikely to go back to casting "unknown" Bachelors and Bachelorettes: "I can't imagine how we would ever get

13

back to that. [Selecting the Bachelor and Bachelorette from the pool of male and female suitors on *The Bachelorette* and *The Bachelor*] works so well for us. People are invested in these characters, they are who they are tuning in for. We have enough new blood by design. We have one returning character with 25 or 30 new faces. I don't think we need new blood across the board."

70. Like the group of female suitors on *The Bachelor*, the group of male suitors on *The Bachelorette* has been overwhelmingly white over the course of the show's 7 seasons. Just as with the role of the Bachelor, the racial homogeneity among the group of suitors is the product of intentional discrimination. In addition, Defendants have only selected as the Bachelor members of the group of suitors on *The Bachelorette* who are white. They have also only selected as the Bachelorette members of the group of suitors on *The Bachelor* who are white. This practice is part and parcel of Defendants' scheme to deny people of color the same employment and contracting opportunities as their white counterparts.

71. A number of similar television shows, airing on different networks, have featured an abundant number of racial minorities. Several shows on VH1, including *Flavor of Love*, *I Love New York*, and *Rock of Love*, use the same format as *The Bachelor* and *The Bachelorette* but have featured a diverse cast of love interests and, in the case of the first two, a person of color in the lead role. These shows demonstrate that a large number of people of color are willing and interested in participating in television shows like *The Bachelor* and *The Bachelorette*.

72. In contrast with *The Bachelor*, ABC's popular television shows *Dancing with the Stars* and *Extreme Makeover: Weight Loss Edition* ("*Extreme Makeover*") have featured a number people of color.

14

73.     *Dancing with the Stars* is an elimination-style game show in which various celebrities partner with a professional dancer and participate in a ballroom dance competition. In the upcoming season alone, five out of the 12 contestants are people of color.

74.     *Extreme Makeover* is a reality television show in which each episode features an overweight person's attempt to lose weight and live a healthier lifestyle. During the previous season of *Extreme Makeover*, at least two of the eight people featured on the show were persons of color.

75.     Unlike *The Bachelor* and *The Bachelorette*—the central theme of which is finding "love"—*Dancing with the Stars* and *Extreme Makeover* only involve platonic, as opposed to romantic, relationships among the cast members. This indicates that the presence of people of color in ABC programming is acceptable so long as there is no exhibition of actual romance between non-whites or whites and people of color.

76.     *The Bachelor* and *The Bachelorette* are examples of purposeful segregation in the media that perpetuates racial stereotypes and denies persons of color of opportunities in the entertainment industry. Studies have shown that television is extremely influential in shaping the way people view one another and themselves. *See* Ardis C. Martin, "Television Media as a Potential Negative Factor in the Racial Identity Development of African American Youth," *Academic Psychiatry* (2008), *available at* http://ap.psychiatryonline.org/data/Journals/AP/2655/08AP338.PDF.

77.     The exclusion of people of color from *The Bachelor* and *The Bachelorette* sends the message—to whites and racial minorities—that only all-white relationships are desirable and worthy of national attention.

15

78.     With such a massive viewership, Defendants have the opportunity to help normalize minority and interracial relationships by showcasing them to mainstream America on *The Bachelor* and *The Bachelorette*.  Instead, by discriminatorily refusing to cast people of color in the lead roles (as well as in the role of suitor), Defendants play into the perceived racial fears of their audience and perpetuate outdated racial taboos.

79.     In addition, studies show that people of color continue to be excluded from business and commerce despite longstanding laws that prohibit racial discrimination in contracting.  *See* The Department of Commerce, "Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Business," (2010) available at http://www.commerce.gov/sites/default/files/documents/2010/november/hinson092210compelling_interest_narrative.pdf.  This case represents one example of those continued barriers.

80.     Most importantly, for the purposes of this class action, Defendants have intentionally denied Plaintiffs and many other applicants of color the equal opportunity as whites to contract without regard to skin color.  This willful exclusion of people of color from the role of the Bachelor and Bachelorette is a plain violation of 42 U.S.C. § 1981 and sections 51 and 51.5 of the California Civil Code.

## CLASS ACTION ALLEGATIONS

81.     This case is brought as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Plaintiffs seek injunctive and declaratory relief through the establishment of a class pursuant to Fed. R. Civ. P. 23(b)(2), as well as punitive damages.  Plaintiffs seek certification of this action as a class action on behalf of all people of color who have unsuccessfully applied to become the Bachelor or Bachelorette during

16

the liability period and met all of the baseline eligibility requirements set by Defendants. This case is properly brought as a class action under Fed. R. Civ. P. 23 for the reasons set forth in the following paragraphs.

82. Membership in the Class is so numerous that separate joinder of each member is impracticable. The number of Class Members is unknown but can be readily determined by Defendants' records. Plaintiffs reasonably estimate that there are, at a minimum, over a hundred persons in the Class.

83. Plaintiffs' claims are typical of the Class, and Plaintiffs have no adverse interests vis-à-vis the other Class members. Although Plaintiffs are both male and some class members will be female, this case is only about racial discrimination.

84. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in contract discrimination class actions and complex litigation.

85. There are numerous and substantial questions of law and fact common to all Class members which control this litigation and predominate over any individual issues. These include:

    a. Whether Defendants engaged in a common practice or policy of denying applicants of color the same opportunity to be considered as white applicants;

    b. Whether Defendants' policies and practices are racially motivated;

    c. Whether Defendants intentionally excluded people of color from the role of the Bachelor and Bachelorette in order to appease the show's consumers and advertisers;

d. Whether any such exclusion constitutes a legitimate basis for Defendants' racial discriminatory policies and practices;

e. Whether Defendants' stated reasons (such as there are no people of color interested in the lead roles) for failing to cast people of color as the Bachelor and Bachelorette are pretextual;

f. Whether Defendants were put on notice that the two shows have never featured a person of color in the lead roles of Bachelor and Bachelorette;

g. Whether Plaintiffs and Class members are entitled to injunctive and declaratory relief against Defendants;

h. Whether Defendants' conduct was undertaken with malice or reckless indifference to the rights of Plaintiffs and Class members to be free from racial discrimination to warrant an award of punitive damages;

86. Defendants have acted, and refused to act, on grounds generally applicable to the Class, making it appropriate for declaratory or injunctive relief on a class-wide basis by denying people of color the opportunity to become the next Bachelor or Bachelorette.

87. A class action is superior to other available methods of fair and efficient adjudication of this controversy. Absent a class action, applicants of color will continue to suffer racial discrimination by Defendants, whose violations of law will proceed without remedy.

88. Most individual Class members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation, the size and scope of Defendant's policies and practices, the significant costs attendant to litigation on this scale, and the comparatively small (although significant) damages suffered by individual Class members.

89.     This action will result in the orderly and expeditious administration of Class claims.  Economies of time, effort, and expense will be fostered and uniform decisions will be ensured.

90.     This action presents no difficulty that would impede its management by the Court as a class action.

## CAUSES OF ACTION

### COUNT 1
### (Racial Discrimination under 42 U.S.C. § 1981)

91.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92.     Defendants intentionally discriminated against Plaintiffs and Class members on the basis of their race by denying them the same opportunity to contract and become the Bachelor or Bachelorette as white applicants.

93.     By refusing to genuinely consider applicants of color for the lead role on *The Bachelor* and *The Bachelorette*, Defendants engaged in a common scheme of unlawfully discriminating against non-whites in the formation of contracts and therefore denied them the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

94.     Defendants have been put on notice that the two shows have never featured a person of color in the lead roles of Bachelor and Bachelorette.

95.     At no time have Defendants undertaken corrective action to ameliorate their racially discriminatory policy and practices now inherent in their casting process.

96.     Defendants' actions violate 42 U.S.C. § 1981.

19

97.     Defendants have damaged Plaintiffs and members of the Class because they have suffered economic loss and been denied economic advantage as a result of Defendants' illegal racial discrimination.

98.     On behalf of themselves and the Class, Plaintiffs request relief as provided in the prayer for relief below.

## COUNT 2
### (Discrimination on the Basis of Race in violation of Unruh Civil Rights Act, California Civil Code § 51)

99.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100.     Defendants are business establishments within the meaning of California Civil Code § 51.

101.     Defendants created and/or maintained policies and/or practices by their predominantly white leadership that are discriminatory against people of color.

102.     Defendants intentionally discriminated against Plaintiffs and Class members on the basis of race by denying them full and equal accommodations, advantages, facilities, privileges, and services afforded to the white applicants selected as the Bachelor and Bachelorette.

103.     The pattern of inequity with respect to the roles of the Bachelor and Bachelorette is the result of an ongoing and continuous pattern and practice of intentional discrimination against people of color.

104.     Defendants have been put on notice that the two shows have never featured a person of color in the lead roles of Bachelor and Bachelorette.

20

105.    At no time have Defendants undertaken corrective action to ameliorate their racially discriminatory policy and practices now inherent in their casting process.

106.    Defendants' actions violate California Civil Code § 51.

107.    Defendants' discriminatory conduct caused Plaintiffs and members of the Class injury.

108.    On behalf of themselves and the Class, Plaintiffs request relief as provided in the prayer for relief below.

**COUNT 3**
**(Discrimination on the Basis of Race in Violation of the Unruh Civil Rights Act, California Civil Code § 51.5)**

109.    Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 108 as if fully set forth herein.

110.    Defendants are business establishments within the meaning of California Civil Code § 51.5.

111.    Defendants created and/or maintained policies and/or practices by their predominantly white leadership that are discriminatory against people of color.

112.    Defendants intentionally discriminated against Plaintiffs and Class members on the basis of race by only selecting white applicants for the Bachelor and Bachelorette and refusing to select applicants of color.

113.    The pattern of inequity with respect to the roles of the Bachelor and Bachelorette is the result of an ongoing and continuous pattern and practice of intentional discrimination against people of color.

114.    Defendants have been put on notice that the two shows have never featured a person of color in the lead roles of Bachelor and Bachelorette.

21

115.     At no time have Defendants undertaken corrective action to ameliorate their racially discriminatory policy and practices now inherent in their casting process.

116.     Defendants' actions violate California Civil Code § 51.5.

117.     Defendants' discriminatory conduct caused Plaintiffs and members of the Class injury.

118.     On behalf of themselves and the Class, Plaintiffs request relief as provided in the prayer for relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     That this case be maintained as a class action on behalf of the proposed class, that Plaintiffs be designated as representatives of the class, and that their counsel of record be designated as Class Counsel;

2.     That the practices of the Defendants complained of herein be determined and adjudged to be in violation of the rights of the Plaintiffs and members of the Class under 42 U.S.C. § 1981 and sections 51 and 51.5 of the California Civil Code;

3.     That an injunction be issued prohibiting Defendants and their officers, agents, employees, and successors from engaging in the business practices complained of herein and requiring the adoption of appropriate policies and programs consistent with Defendants' legal obligations to contract without regard to race;

4.     That an injunction be issued requiring Defendants to consider persons of color as finalists for the role of the Bachelor and the Bachelorette;

22

5. That judgment be entered in favor of Plaintiffs and the members of the Class set forth herein, and against Defendants;

6. That the Plaintiffs and the members of the Class be awarded punitive damages;

7. That the Plaintiffs and the members of the Class be awarded pre and post judgment interest;

8. That the Plaintiffs and the members of the Class be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

9. That the Court award Plaintiffs and the members of the Class reasonable attorneys' fees and costs associated with the prosecution of this lawsuit;

10. That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law.


Dated: April 18, 2012                    Respectfully Submitted,


                                         /s/ George E. Barrett
                                         George E. Barrett, Esq.
                                         Barrett Johnston, LLC
                                         217 Second Avenue North
                                         Nashville, TN 37201
                                         Phone: (615) 244-2202
                                         Fax: (615) 252-3798
                                         gbarrett@barrettjohnston.com

                                         Cyrus Mehri, Esq.
                                         Michael P. Lieder, Esq.
                                         Zachary W. Best, Esq.
                                         1250 Connecticut Avenue N.W., Suite 300
                                         Washington, D.C.
                                         Phone: (202) 822-5100

23

Fax: (202) 822-4997
cmehri@findjustice.com
mlieder@findjustice.com
zbest@findjustice.com


Byron R. Perkins, Esq.
Terrinell Lyons, Esq.
Perkins-Law, LLC
2170 Highland Ave. South, Suite 100
Birmingham, AL 35205
Phone: (205) 558-4696
Fax: (205) 558-4670
bperkins@perkins-law.com
terrinelllyons@aol.com