UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NATHANIEL CLAYBROOKS and CHRISTOPHER JOHNSON, individually, on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 3:12-cv-00388 |
| v. | ) | Judge Aleta A. Trauger |
| | ) | |
| AMERICAN BROADCASTING COMPANIES, INC., WARNER HORIZON TELEVISION, INC., NEXT ENTERTAINMENT, INC., NZK PRODUCTIONS, INC., and MICHAEL FLEISS, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the court are several motions relating to the plaintiffs' Amended

Complaint and choice of venue. The defendants have filed a Motion to Dismiss Amended

Complaint (Docket No. 38) and an Alternative Motion to Strike Request for Injunctive Relief and

Class Allegations (Docket No. 45), to which the plaintiffs filed a consolidated Response in

opposition to both motions (Docket No. 84), and the defendants filed separate Replies thereto

(Docket Nos. 91 (Motion to Dismiss) and 93 (Motion to Strike)).[1] The defendants have also filed

a Motion to Transfer Venue (Docket No. 59), which is not yet fully briefed and with respect to

---

[1]With respect to the Motion to Dismiss, the defendants also filed an accompanying
Request for Judicial Notice of various materials outside the pleadings. (Docket No. 39.) After
receiving briefing from the parties on the issue, the court declined to convert the Motion to
Dismiss to a motion for summary judgment and, therefore, held that it would not consider the
materials subject to the Request for Judicial Notice. (Docket No. 58.) The Request for Judicial
Notice will be denied as moot.

1

which the parties have engaged in venue-specific discovery.  (*See* Docket Nos. 86, 99, 100.)[2]

For the reasons stated herein, the Motion to Dismiss will be granted, the remaining

motions will be denied as moot, and the plaintiffs' claims will be dismissed with prejudice.

## BACKGROUND[3]

### I.     The Shows at Issue and the Plaintiffs' Associated Discrimination Claims

This case concerns the popular television shows *The Bachelor* and *The Bachelorette* (the

"Shows"), which collectively have aired since 2002 on the "ABC" channel.  Defendant American

Broadcasting Companies, Inc. ("ABC") broadcasts these Shows, and the remaining defendants

are companies and an individual otherwise involved in producing the Shows (collectively,

"defendants").  The named plaintiffs, Nathaniel Claybrooks and Christopher Johnson, are two

African-American males who unsuccessfully applied to be the "Bachelor" in 2011.

*The Bachelor*, which debuted in 2002 on ABC, is a popular "reality television" show in

which approximately 25 women compete for the affections of a single man – the "Bachelor."

Each season of *The Bachelor* features a different Bachelor and a different pool of female suitors.

In 2003, *The Bachelorette* debuted as a spin-off of *The Bachelor*.  The Shows are essentially

identical, except that the gender roles are reversed – *i.e.*, in *The Bachelorette*, a pool of male

suitors competes for the affections of the "Bachelorette."  In total, there have been 16 seasons of

---

[2]The defendants also filed a Request for Judicial Notice in support of the Motion to
Transfer Venue.  (Docket No. 61.)

[3]Unless otherwise noted, all allegations are drawn from the plaintiffs' Amended
Complaint.  (Docket No. 34.)  Pursuant to the court's previous Order (Docket No. 58), the court
does not consider any additional factual materials filed by the defendants.

2

*The Bachelor* and 8 seasons of *The Bachelorette*.[4]

As a condition of participating on either Show, the Bachelor or Bachelorette signs a casting contract with the defendants. The Bachelor/Bachelorette receives a stipend and enjoys various other benefits of participating on either Show, including fully paid housing, food, and travel expenses, as well the financial and professional benefits of celebrity status after his or her participation ends.

ABC's website states that "there has been an eclectic mix of bachelors over the years. We've seen a doctor, football star, prince, millionaire, [and a] single dad." (Am. Compl. ¶ 37 (brackets in original).) Despite this "eclectic mix," none of the Bachelors or Bachelorettes has been a person of color – that is, across 24 combined seasons, all of the Bachelors and Bachelorettes have been white. Furthermore, the vast majority of "suitors" for the Bachelor and Bachelorette have been white, and the few non-white contestants tend to be eliminated early on in each show. Thus, the weekly Shows typically feature a white Bachelor/Bachelorette and all (or nearly all) white suitors.

The plaintiffs allege "[t]he shows' complete lack of people of color is no accident." (*Id.* ¶ 40.) They allege that, as a matter of internal policy, the defendants have intentionally cast only white Bachelors and Bachelorettes. According to a news article, the shows' producers have feared "potential controversy stemming from an interracial romance," (*id.* ¶ 44), which they believe would alienate the Shows' predominantly white viewership. The plaintiffs allege that, for

_____

[4]The plaintiffs' Amended Complaint alleges that the Eighth Season of *The Bachelorette* debuted on May 14, 2012. (Am. Compl. ¶ 32.) Therefore, the court will assume that there have been 24 combined seasons of *The Bachelor* and *The Bachelorette*. The parties appear to agree that, as with all previous seasons, the Bachelorette in the Eighth Season of *The Bachelorette* was white.

this reason, the defendants have intentionally refused to cast non-white Bachelors and Bachelorettes, to avoid the possibility that a particular season could end with an interracial couple. Thus, "[b]y hiring only white applicants, Defendants are making the calculation that minorities in lead roles and interracial dating is unappealing to the shows' audiences. The refusal to hire minority applicants is a conscious attempt to minimize the risk of alienating their majority-white viewership and the advertisers targeting that viewership." (*Id.* ¶ 68.)

The plaintiffs allege that various television shows on other networks have, by contrast, "featured an abundant number of racial minorities." (*Id.* ¶ 71.) Although ABC has also broadcasted shows involving minorities, those shows "involve platonic, as opposed to romantic, relationships among the cast members." (*Id.* ¶ 75.) According to the plaintiffs, "[t]his indicates that the presence of people of color in ABC programming is acceptable so long as there is not exhibition of actual romance between non-whites or whites and people of color." (*Id.* ¶ 75.)

The plaintiffs allege that *The Bachelor* and *The Bachelorette* "are examples of purposeful segregation in the media that perpetuates racial stereotypes and denies persons of color of opportunities in the entertainment industry." (*Id.* ¶ 76.) According to the plaintiffs, "[s]tudies have shown that television is extremely influential in shaping the way people view one another and themselves." (*Id.*) Accordingly, "[t]he exclusion of people of color from *The Bachelor* and *The Bachelorette* sends the message – to whites and racial minorities – that only all-white relationships are desirable and worthy of national attention." (*Id.* at ¶ 77.) From the plaintiffs' perspective, the defendants' communication of this "message" has a deleterious effect on society:

> With such a massive viewership, Defendants have the opportunity to help
> normalize minority and interracial relationships by showcasing them to
> mainstream America on *The Bachelor* and *The Bachelorette*. Instead, by
> discriminatorily refusing to cast people of color in the lead roles (as well as in the

4

role of suitor), Defendants play into the perceived racial fears of their audience and perpetuate outdated racial taboos.

(*Id.* ¶ 78.)

The plaintiffs allege that they and other minority applicants have been denied the equal opportunity to contract to be the Bachelor or the Bachelorette, in violation of 42 U.S.C. § 1981, a statute that, among other things, prohibits discrimination in the formation of contracts.[5]  They seek to certify a class of plaintiffs consisting of all non-white applicants who met the shows' baseline eligibility requirements.  The plaintiffs seek nominal damages, punitive damages, and two forms of injunctive relief: (1) an injunction prohibiting the defendants from engaging in the alleged discriminatory practices; and (2) an injunction requiring the defendants to consider non-whites as finalists for the role of the Bachelor and the Bachelorette.

## II.     The Casting Process

To cast the roles of the Bachelor and Bachelorette, the defendants solicit mail-in applications through their website and conduct casting calls in various locations across the country.  Applicants must fill out a questionnaire and provide recent photographs and/or video of themselves.  Applicants selected as semi-finalists are flown to Los Angeles for additional interviews and must submit additional paperwork.

In 2011, plaintiff Johnson appeared for a casting call at a hotel in Nashville, Tennessee. In the hotel lobby, a white employee of the defendants stopped Johnson, took his materials, and promised to "pass them on" to the casting directors.  Johnson observed that the white employee

---

[5]The plaintiffs' original Complaint also included claims arising under California state law.  (*See* Docket No. 1, Compl.)  In the Amended Complaint, which is now the operative pleading in this case, the plaintiffs assert only the federal claim arising under § 1981.

5

did not stop any of the white Bachelor applicants who were entering the hotel for the casting call at the same time.  Johnson never heard back from the Defendants about his application.  In 2011, plaintiff Claybrooks appeared for a casting call at a different hotel.  In the lobby, all of the other applicants appeared to be white.  Although interview of these white applicants took about 45 minutes, Claybrooks's interview lasted only 20 minutes, making him feel that he had been rushed through the interview process without being given the same opportunity as the white applicants.  Like Johnson, Claybrooks never heard back from the defendants concerning his application.  The defendants ultimately selected a white Bachelor for its 2012 season.

## III.    The Defendants' Arguments

In support of their Motion to Dismiss, the defendants argue that the case should be dismissed with prejudice on either of two grounds: (1) the First Amendment to the United States Constitution bars the plaintiffs' claims; and/or (2) the "void-for-vagueness" doctrine bars the plaintiffs' claims.  The defendants also argue that, if the claims are not barred on either of those grounds, the Amended Complaint should be dismissed without prejudice because the plaintiffs have not pleaded sufficient facts to establish a violation of § 1981.

In support of their Alternative Motion to Strike, the defendants argue that, if the court refuses to dismiss the case entirely, the court should at least find that (1) the proposed injunctions constitute an unconstitutional prior restraint and/or are impermissibly vague and superfluous; and/or (2) the plaintiffs' class allegations have not been pleaded with sufficient particularity.

## STANDARD OF REVIEW

## I.    Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6),

the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To establish the "facial plausibility" as required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009).

## II.     First Amendment as an Affirmative Defense

The plaintiffs suggest that, as a matter of law, it is premature for this court to address the defendants' First Amendment defense at the pleading stage. (*See* Docket No. 84, Pltfs. Mem. at p. 5 (stating that the court should refrain from ruling on the validity of the claims "until after discovery and development of a full evidentiary record").) However, "where the undisputed facts

7

conclusively establish an affirmative defense as a matter of law," a motion to dismiss may be granted.  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).  This principle applies to First Amendment defenses at the pleading stage: when a plaintiff's allegations establish that the First Amendment bars the plaintiff's claims as a matter of law, federal courts may dismiss those claims.  *See Windsor v. The Tennessean*, 719 F.2d 155, 162-63 (6th Cir. 1983) (finding that dismissal of plaintiff's § 1985(1) claims against certain defendants was appropriate pursuant to Rule 12(b)(6), because, *inter alia*, defendants had "agreed to engage in constitutionally protected speech"); *see also Eagles Nest Ranch & Acad. v. Bloom Twp. Bd. of Trs.*, No. 2:06-CV-242, 2007 WL 650485, at *5 (S.D. Ohio Feb. 26, 2007); *Barr v. Clinton*, 370 F.3d 1196, 1203 (D.C. Cir. 2004); *Best v. Berard*, 776 F. Supp. 2d 752, 753 (N.D. Ill. 2011); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 974 (C.D. Cal. 2007).

Consistent with this recognized approach, the court will analyze the plaintiffs' allegations to determine whether they establish that the First Amendment bars their claims as a matter of law.

## ANALYSIS

I.  ## Applicable Law

A.  ### § 1981 and the First Amendment

This case involves potential tension between two federal interests: the federal statutory interest in preventing racial discrimination in the formation of contracts, as embodied in 42 U.S.C § 1981, and the federal constitutional First Amendment right to freedom of speech.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by

8

white citizens . . . ." 42 U.S.C. § 1981(a) (2012).[6] Thus, the statute "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006); *see also Runyon v. McCrary*, 427 U.S. 160, 173, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976) ("§ 1981 . . . reaches private conduct.")  Here, at least for purposes of the defendants' argument that the First Amendment trumps § 1981, the parties appear to agree that § 1981 applies to casting decisions for the Shows, because the casting decisions involve the formation and execution of contracts to become the Bachelor or Bachelorette.[7]

The First Amendment to the United States Constitution provides, in relevant part, that "[C]ongress shall make no law . . . abridging the freedom of speech . . . ."  The First Amendment shields protected speech and expression from private litigation, as well as from statutory restrictions and criminal penalties.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78, 84 S. Ct. 710, 725, 376 U.S. 254, 11 L. Ed. 2d 686 (1964); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 n.51, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982).  The First Amendment protects a variety of artistic forms of expression, including entertainment, television programs, and dramatic works.  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981).  Here, the parties agree that the Shows are expressive works that constitute speech protected by the First Amendment.  However, they disagree as to whether the casting

---

[6]The statute defines "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

[7]The defendants do not appear to concede this point with respect to their "void for vagueness" argument.  However, for the reasons stated herein, the court does not reach the void for vagueness argument in any case.

9

decisions behind those Shows are also protected by the First Amendment.

As explained herein, the court finds that casting decisions are part and parcel of the creative process behind a television program – including the Shows at issue here – thereby meriting First Amendment protection against the application of anti-discrimination statutes to that process. Thus, as applied here, § 1981 would force the defendants to employ race-neutral criteria in the casting process, thereby regulating the creative content of the Shows. Accordingly, as applied in this specific context, § 1981 regulates speech based on its content – *i.e.*, the race(s) of the Shows' respective cast members – which implicates strict scrutiny. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000); *see also Netherland v. City of Zachary, La.*, 626 F. Supp. 2d 603, 607 (M.D. La. 2009) (applying strict scrutiny analysis, where application of city-ordinance was content-based). Under that test, the plaintiffs must show that applying § 1981 here would (1) advance a compelling government interest; and (2) is narrowly tailored to serve that interest. The parties only dispute the second element.[8]

###### B. The Intersection of § 1981 and the First Amendment Generally

----

[8]Notwithstanding the unique context of this case, the plaintiffs argue that the court should treat § 1981 as a content-neutral statute and apply the intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968). Under *O'Brien*, a content-neutral statute that incidentally impacts speech survives a First Amendment challenge if (1) the statute is within the constitutional power of the government, (2) the statute furthers an important or substantial government interest, (3) the interest is unrelated to the suppression of free expression, and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 377. Even if the court were to construe *O'Brien* as applicable to this case, the application of § 1981 plainly would, for the reasons expressed in detail herein, impose an undue and impermissible incidental restriction on the defendants' First Amendment freedoms, thereby failing the fourth factor of the *O'Brien* test.

Although media organizations are subject to laws of general applicability,[9] the Supreme

Court has expressly found that the First Amendment can trump the application of anti-

discrimination laws to protected speech. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*

*of Boston*, 515 U.S. 557, 568, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995). In *Hurley*, the Court

considered "whether Massachusetts law could require private citizens who organize a parade to

include among the marchers a group imparting a message the organizers do not wish to convey."

*Id.* at 559. There, the Irish American Gay, Lesbian, and Bisexual Group of Boston ("GLIB")

sought to march in the annual Saint Patrick's day parade in Boston, which was organized and

conducted by the South Boston Allied War Veterans Council ("Council"), an unincorporated

association of individuals from various South Boston veterans groups. *Id.* at 560. In an effort to

express solidarity on behalf of Irish-American gays, lesbians, and bisexuals, GLIB sought to

march in the parade, but the Council refused to permit them to participate.

At the time, a Massachusetts law of general applicability banned discrimination in public

accommodations based on, *inter alia*, sexual orientation. *Id.* at 561. Accordingly, GLIB sued for

the right to participate in the parade, arguing that the Massachusetts public accommodations law

forbade the parade organizers from discriminating against GLIB, thereby requiring the Council to

accommodate it. *Id.* The Massachusetts trial court – and, on appeal, the Massachusetts Supreme

Judicial Court – found that "it was impossible to discern any specific expressive purpose entitling

the Parade to protection under the First Amendment." *Id.* at 564. Based on this finding, in

---

[9]*See Associated Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103, 132-33, 57 S. Ct. 650, 81 L. Ed. 953 (1937); *Leathers v. Matlock*, 499 U.S. 439, 447, 111 S. Ct. 1438, 113 L. Ed. 2d 494 (1991); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 383-84, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973).

relevant part, the Massachusetts courts found that the Massachusetts anti-discrimination statute trumped any incidental affect on the parade organizer's First Amendment free speech rights. *Id.*

On appeal, the United States Supreme Court reversed. The Court found that "parades are a form of expression" entitled to First Amendment protection. *Id.* at 568. The Court squarely rejected the view, adopted by the state courts below, that the Council was required to show that the parade had a particular expressive purpose to justify First Amendment protection:

> [A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a "particularized message," *cf. Spence v. Washington,* 418 U.S. 405, 411, 94 S. Ct. 2727, 2730, 41 L. Ed. 2d 842 (1974) (*per curiam*), would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.

*Hurley*, 515 U.S. at 569-70.[10]

The Court then analyzed whether Massachusetts law could compel the Council to adjust the creative content of its parade. With respect to the application of the public accommodations law, the Court observed that this law "has been applied in a peculiar way" by the Massachusetts

---

[10]In reliance on *Spence* and certain decisions concerning the First Amendment right to freedom of association, the plaintiffs suggest that the defendants cannot establish a First Amendment defense without showing that the Shows embody a "particularized message." (*See* Pltfs. Mem. at p. 7-12 (citing, *inter alia*, *Hishon v. Spalding*, 467 U.S. 69, 78, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000); *City of Dallis v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989); and *Rumsfeld v. Forum for Academic Freedom & Institutional Rights, Inc.*, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).) That is an incorrect statement of the law, which the Court expressly rejected in *Hurley*. Moreover, the court does not construe the defendants as asserting a defense based on the freedom of association, in any case. Thus, the court's inquiry here does not turn on whether the plaintiffs' allegations establish that the Shows convey or were intended to convey a "particularized message," or whether the plaintiffs' preferred message necessarily would be inconsistent therewith. Instead, the issue is whether applying § 1981 to the act of casting a television program would interfere with the defendants' right to control the Shows' expressive content – whatever that may be – which the plaintiffs concede is otherwise protected by the First Amendment.

12

lower courts. *Id.* at 572. "Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order *essentially requiring petitioners to alter the expressive content of their parade*." *Id.* at 572-73 (emphasis added). Thus, as here, the plaintiff sought to apply an anti-discrimination statute in a manner that threatened to alter the content of the defendant's expressive work, triggering an exacting analysis by the Court.[11]

The Court observed that "a speaker has the autonomy to choose the content of his own message," and that, "'[s]ince all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say.'" *Id.* (quoting *Pacific Gas & Elec. Co. v. Public Util. Comm'n*, 475 U.S. 1, 11, 16, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986)).

Accordingly, the Court found that the parade organizers had a First Amendment right to control the content of their own parade:

> Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day. . . . [A] contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to

---

[11]In *Hurley*, the Court did not state whether it was analyzing the application of the state statute under a strict scrutiny analysis or under the *O'Brien* intermediate scrutiny analysis. However, the Court's analysis suggests that it was undertaking a strict scrutiny approach to determine whether applying the Massachusetts anti-discrimination statute amounted to a content-based restriction on the parade organizer's fundamental free speech rights in any respect. *See, e.g.*, *Hurley*, 515 U.S. at 572 ("[T]his use of the state's power violates the fundamental role of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.") and 579 (construing application of the statute in the manner urged by the plaintiffs as "nothing less than a proposal to limit speech in the service of orthodox expression").

Case 3:12-cv-00388  Document 101  Filed 10/15/12  Page 13 of 23 PageID #: 1629

unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics. The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. *But whatever the reason*, it boils down to *the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control.*

*Id.* at 574-75 (emphases added). Based on these findings, the Court held that the First

Amendment trumped the Massachusetts anti-discrimination statute:

The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.

*Id.* at 579 (internal citations omitted).

The factual circumstances in *Hurley* are not precisely analogous to those presented in this case – the plaintiffs here are not an advocacy group, for example. Nevertheless, the Court in *Hurley* articulated a general principle that governs the court's analysis in this case: under appropriate circumstances, anti-discrimination statutes of general applicability must yield to the First Amendment. *See also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) (holding that First Amendment Establishment and Free Exercise Clauses barred application of employment discrimination statutes to religious institution's selection of its own ministers). As the plaintiffs concede, this principle applies equally to § 1981 discrimination claims. (*See* Pltfs. Mem. at p. 11, n.1.) The plaintiffs also concede that this principle applies to casting decisions for at least some types of television programs, but not all. (*Id.*)

14

### C. Absence of Precedent Applying First Amendment to Casting Decisions

Although the parties agree that the First Amendment protects the creative content of *The Bachelor* and *The Bachelorette*, they vigorously disagree as to whether the First Amendment protects the casting decisions for those programs. With respect to casting decisions for an entertainment program of any kind, it appears that no federal court has addressed the relationship between anti-discrimination laws and the First Amendment. Thus, although the parties fault each other for failing to identify any federal case law specifically addressing this issue,[12] the court does not interpret the absence of precedent on this issue as suggesting any particular result here. Accordingly, the court must analyze this issue of first impression in light of relevant First Amendment principles.

### II. Application of First Amendment Principles to Casting Decisions

#### A. The Court Must Assume that the Defendants in Fact Discriminated in Casting *The Bachelor* and *The Bachelorette*.

In an introductory paragraph in their Memorandum in support of their Motion to Dismiss, the defendants argue that, contrary to the Amended Complaint allegations, they "share the

---

[12]The only case cited by the parties that even remotely addresses the issue of casting is *Tamkin v. CBS Broadcasting, Inc.*, 122 Cal. Rptr. 3d 264 (Cal. Ct. App. 2011), cited by the defendants. There, the California Court of Appeals addressed the application of a state anti-SLAPP statute, which protected "any act of [the defendant] *in furtherance of* the person's right of . . . free speech." *See* Cal. Code Civ. Proc. § 425.16(b)(1) (2012) (emphasis added). Under this statute, which extends "broadly to reach conduct beyond the actual exercise of speech," *Greater LA Agency on Deafness v. CNN, Inc.*, No. C-11-03458 LB, 2012 WL 994647, at *3 (N.D. Cal. Mar. 23, 2012), the *Tamkin* court found that the defendants' writing and dissemination of a screenplay constituted acts in furtherance of "the creation, casting, and broadcasting of an episode of a popular television show." *Tamkin*, 122 Cal. Rptr. at 271. Here, the court does not rely on *Tamkin* for several reasons: it is a state court decision, which is of limited persuasive weight in the first place; it concerns a state statute whose broad scope clouds the potential relevance of the *Tamkin* court's First Amendment analysis with respect to casting; and its statement implying that casting constitutes free speech appears to be *dicta*, in any case.

15

Plaintiffs' goals of reducing racial bias and prejudice and fostering diversity, tolerance and inclusion," and "have never discriminated based on race in connection with the casting process" for the Shows. (Docket No. 42, Defs. Mem., at p. 1.) Notwithstanding these representations, the defendants argue that the plaintiffs, by suing the defendants under § 1981, essentially seek to co-opt the Shows to showcase the plaintiffs' own preferred message of racial acceptance. In response, the plaintiffs argue that, based on the defendants' representations in their briefing that race is not a factor in casting the Shows, applying § 1981 necessarily would not actually alter the Shows' expressive content.

Regardless of whether applying § 1981 would *in fact* alter the Shows' content, the court must analyze whether the well-pleaded factual allegations in the Amended Complaint– not the defendants' briefing representations about the real world accuracy of those representations – establishes a First Amendment defense. Thus, the court must assume, as alleged in the Amended Complaint, that the defendants *did* discriminate on the basis of race, that they did so to conform the content of their Shows to cater to the viewpoint of their target audience concerning interracial relationships, that the Shows' content thereby perpetuates racial stereotypes about interracial relationships, and that the plaintiffs seek to alter/correct the defendants' casting decision process to address that issue.[13]

## B. Whether Casting Decisions are a Form of Conduct Devoid of Sufficient Creative Expression.

_____

[13]Regardless, as discussed herein, the First Amendment protects the defendants' ability to control the content of their own programs unilaterally. Thus, whether applying § 1981 here would actually enhance the Shows' expressive content, contradict that content, or not affect it all is essentially beside the point, because the defendants – not the plaintiffs – are entitled to control the casting of their own programs in the manner in which they see fit.

Supreme Court precedent establishes that conduct constitutes protected speech if it is "sufficiently imbued with elements of communication to fall within [the First Amendment's] scope." *Spence*, 418 U.S. at 409-10.[14]  On the other hand, at some point, conduct ceases to be materially communicative for First Amendment purposes.  *See Dallas*, 490 U.S. at 25.  Indeed, "it is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  *Id.*

The plaintiffs' position concerning whether casting decisions are protected by the First Amendment appears to be internally inconsistent in at least one respect.  Although the plaintiffs appear to argue that casting decisions always involve conduct – the formation of a contract – that is not materially communicative (*see* Pltfs. Mem. at pp. 7-9), they also concede that casting decisions that "would undoubtedly affect [a] shows' content" are entitled to First Amendment protection (*id.* at p. 11, n.1).  Thus, the court construes the plaintiffs as arguing that § 1981 applies to casting decisions *in some contexts, but not others,* apparently based on a court's assessment of whether enforcing § 1981 would actually affect the particular show's message.

The defendants convincingly argue that applying anti-discrimination laws to casting decisions in this manner would threaten the content of various television programs and television

_____

[14]For example, burning an American flag, wearing a jacket imprinted with "Fuck the Draft" during the Vietnam war era, wearing black armbands to show objection to the Vietnam war, hanging an American flag upside down with a peace sign, and forming a parade to celebrate Irish heritage all are forms of conduct with a sufficiently communicative element to constitute speech protected by the First Amendment.  *See Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (flag burning); *Cohen v. California*, 403 U.S. 15, 18, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (imprinted jacket); *Tinker v. Des Moines Indep. Cmty. Sch. Dist*, 393 U.S. 503, 504, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (armbands); *Spence*, 418 U.S. at 414-15 (upside down flag); *Hurley*, 515 U.S. at 568 (Irish heritage parade).

networks. For example, the legality of any network targeting particular demographic groups would be called into question, including, *inter alia*, the Lifetime Network (targeted to female audiences), the Black Entertainment Channel (targeted to African-Americans), Telemundo (targeted to Latinos), the Jewish Channel, the Christian Broadcast Channel, the Inspiration Network (targeted to Protestants), and LOGO (targeted to gays and lesbians). (*See* Defs. Mem. at p. 11.) Similarly, the content of any television show that does not have a sufficiently diverse cast would be or would have been subject to court scrutiny, such as *The Jersey Shore* (all white cast members), *The Shahs of Beverly Hills* (a show about Persian-Americans living in Los Angeles), *The Cosby Show* (a show with an African-American cast), and *The Steve Harvey Show* (a show with an African-American lead actor and supporting cast). (*See* Defs. Mem. at p. 12.) To the extent that these networks and programs discriminated and discriminate in their casting choices, would they not be subject to civil liability under prevailing state and/or federal anti-discrimination statutes, but for the First Amendment? There are other examples: Would applying anti-discrimination laws require a playwright to consider white actors to play Othello, black actors to play Macbeth, or a male to play Lady Macbeth? For that matter, could a dramatist face civil liability for staging an all-female version of *Romeo & Juliet*?

In response, the plaintiffs argue that the court should treat *The Bachelor* and *The Bachelorette* differently from "*identity-themed programming* that would be incidentally affected by compliance with anti-discrimination laws," such as networks that are "specifically geared" toward particular demographic groups, like LOGO, BET, Telemundo, and The Jewish Channel, or shows that are "about" African-Americans, like *The Cosby Show*. (Pltfs. Resp. at p. 11 n.1 (emphasis added).) The plaintiffs cite to no legal authority for this purported distinction between

18

"identity-themed programming" and other forms of television programming.

The plaintiffs' proposed test is inherently unwieldy, threatens to chill otherwise protected speech, and, if implemented, would embroil courts in questioning the creative process behind any television program or other dramatic work. How would a court determine the point at which a television program, movie, or play is sufficiently "identity-themed", "specifically geared" to, or "about" a particular racial, religious, or gender group to construe the demographics of its cast as to constitute the show's "content"? How would one even define what the creative "content" of a program is? These are intractable issues that, in light of the First Amendment, are plainly beyond the appropriate scope of a court to address. Indeed, as the Court pointed out in *Hurley*, an expressive work need not have any particularized message to justify First Amendment protection, *see* 515 U.S. at 569-70, and, of course, expressive works can mean different things to different people.[15]

Moreover, as the defendants persuasively argue, casting decisions are a necessary

_____

[15]The prospect of courts sitting in judgment as to whether a television show or network is sufficiently "identity-themed" to warrant First Amendment protections – compared to shows or networks whose content is not sufficiently "about" a particular protected group (whatever that means) – smacks of censorship and prior restraint on creative expression, which would be entirely impermissible under the First Amendment. *See Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976)). Indeed, the prospect of courts issuing injunctions directed to the creative process behind entertainment programs is particularly troubling. *Id.* at 176 ("[W]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases[,]" because "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances.") (citing *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994)); *see also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 224-25 (6th Cir. 1996) ("It has long been established that a prior restraint comes to a court 'with a heavy presumption against its constitutional validity.'") (quoting *Bantam Books v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L. Ed. 2d 584 (1963)).

19

component of any entertainment show's creative content. The producers of a television program, a movie, or a play could not effectuate their creative vision, as embodied in the end product marketed to the public, without signing cast members. The plaintiffs seek to drive an artificial wedge between casting decisions and the end product, which itself is indisputably protected as speech by the First Amendment. Thus, regulating the casting process necessarily regulates the end product. In this respect, casting and the resulting work of entertainment are inseparable and must *both* be protected to ensure that the producers' freedom of speech is not abridged.

At any rate, the plaintiffs' argument essentially ignores a key thrust of their own Amended Complaint, which explicitly takes issue with and seeks to alter the *messaging* of *The Bachelor* and *The Bachelorette*. The Amended Complaint allegations build to the plaintiffs' fundamental disagreement with the expressive content of the Shows: they fault the Shows for "perpetuat[ing] racial stereotypes," because "television is extremely influential *in shaping the way people view one another and themselves*." (emphasis added.) They specifically allege that "the exclusion of people of color from *The Bachelor* and *The Bachelorette sends the message* – to whites and racial minorities – that only all-white relationships are desirable and worthy of national attention" (emphasis added); and they even allege that, instead of seeking "to help normalize minority and interracial relationships by showcasing them to mainstream America," the defendants' casting decisions "play into the perceived racial fears of their audience and perpetuate racial taboos." Indeed, the plaintiffs contrast *The Bachelor* and *The Bachelorette* with other television shows that they believe are appropriately inclusive of racial minorities.

Thus, taking the allegations as true, the plaintiffs have plainly alleged that (1) the racial composition of the Shows conveys an influential message to the viewing public regarding

20

interracial romantic relationships; (2) the defendants consciously made casting decisions to control a message that the Shows convey; (3) the plaintiffs strongly disagree with that message, which they believe is "outdated", "perpetuates racial stereotypes," and caters (or at least is designed to cater) to the allegedly misguided prejudices of the Shows' audience members; and (4) the plaintiffs seek to alter that message to "showcase" their own more progressive message through the application of § 1981. Accordingly, even as alleged by the plaintiffs, the Shows' casting decisions are part and parcel of the Shows' creative content, which the plaintiffs seek to reform. That is plainly an attempt to regulate the content of the Shows, which the First Amendment forbids.

Ultimately, whatever messages *The Bachelor* and *The Bachelorette* communicate or are intended to communicate – whether explicitly, implicitly, intentionally, or otherwise – the First Amendment protects the right of the producers of these Shows to craft and control those messages, based on whatever considerations the producers wish to take into account. *See Hurley*, 515 U.S. at 573 ("A speaker has the autonomy to choose the content of his own message."); *see also McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (approving district court's refusal to grant injunction reinstating newspaper's discharged editorial staff members and reporters, because, "telling the newspaper that it must hire specified . . . editors and reporters . . . is bound to affect what gets published. *To the extent the publisher's choice of writers affects the expressive content* of its newspaper, the First Amendment protects that choice.") (emphasis added). Similarly, "rather like a composer," the defendants are entitled to select the elements (here, cast members) that support whatever expressive message the Shows convey or are intended to convey. *See Hurley*, 515 U.S. at 574. Thus, whether enforcing § 1981

21

here would frustrate, enhance, or be entirely consistent with the message that *The Bachelor* and *The Bachelorette* conveys, the First Amendment protects the producers' right unilaterally to control their own creative content.

The plaintiffs' goals here are laudable: they seek to support the social acceptance of interracial relationships, to eradicate outdated racial taboos, and to encourage television networks not to perpetuate outdated racial stereotypes. Nevertheless, the First Amendment prevents the plaintiffs from effectuating these goals by forcing the defendants to employ race-neutral criteria in their casting decisions in order to "showcase" a more progressive message.

## III. Disposition of the Various Pending Motions

For the reasons stated herein, the court has found that the First Amendment bars the plaintiffs' claims. Accordingly, the court need not reach the defendants' additional arguments that (1) § 1981 is void for vagueness as applied here, and/or (2) the plaintiffs have failed to plead their claims with adequate particularity. Similarly, the plaintiffs' Alternative Motion to Strike, the Motion to Transfer Venue, and the Request for Judicial Notice relative to the Motion to Transfer Venue are now rendered moot.[16]

## CONCLUSION

For the reasons stated herein, the court finds as follows:

- The Motion to Dismiss will be granted and this case will be dismissed with

---

[16]The plaintiffs' lone claim under § 1981 implicates federal law – largely United States Supreme Court precedent – that applies equally in the proposed transferee court (the federal district court for the Central District of California). Likely for this reason, the thrust of the defendants' argument in favor of transfer related to the convenience of the parties and witnesses, considerations that are not affected by the court's disposition of this matter at the pleadings stage. Indeed, neither party raised any objection to this court's ruling on the Motion to Dismiss before considering the Motion to Transfer Venue.

prejudice;

- The Motion for Judicial Notice concerning the Motion to Dismiss will be denied;

- The Alternative Motion to Strike will be denied as moot;

- The Motion to Transfer Venue and associated Request for Judicial Notice will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23