UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NATHANIEL CLAYBROOKS and CHRISTOPHER JOHNSON, individually, on behalf of all others similarly situated, ) ) ) ) Plaintiffs, ) ) v. ) ) AMERICAN BROADCASTING COMPANIES, ) INC., WARNER HORIZON TELEVISION, ) INC., NEXT ENTERTAINMENT, INC., NZK ) PRODUCTIONS, INC., and ) MICHAEL FLEISS, ) ) Defendants. ) | Case No. 3:12-cv-00388 Judge Aleta A. Trauger |

## MEMORANDUM

On October 15, 2012, the court issued an Order in which it dismissed the plaintiffs' First Amended Complaint with prejudice and entered judgment in favor of the defendants. (Docket Nos. 102 and 103.) The plaintiffs have filed a Motion Pursuant to Rule 59(e) to Alter or Amend the Judgment (Docket No. 104) ("Rule 59 Motion") and a Motion Pursuant to Rule 15(a) for Leave to File a Second Amended Complaint (Docket No. 105) ("Rule 15 Motion"). The defendants filed a combined brief in opposition to both motions (Docket No. 113), and the plaintiffs filed a combined Reply (Docket No. 115). For the reasons stated herein, both motions will be denied.

## BACKGROUND

Briefly, this case concerns the ABC network shows *The Bachelor* and *The Bachelorette* (collectively, the "Shows"), in which suitors of one gender compete for the affections of a single

1

member of the opposite sex – the "Bachelor" or the "Bachelorette".[1]

The named plaintiffs, Nathaniel Claybrooks and Christopher Johnson, filed this putative class action lawsuit against the defendants, who are involved in producing and broadcasting the Shows.  In their First Amended Complaint (Docket No. 34), Claybrooks and Johnson alleged that the defendants had illegally discriminated against non-white candidates in selecting the Shows' contestants, including the Bachelor/Bachelorette and the associated suitors, in violation of 42 U.S.C. § 1981.  On October 15, 2012, this court dismissed the First Amended Complaint with prejudice and entered judgment for the defendants, finding that the First Amendment provided a complete defense to the plaintiffs' claims.  *See Claybrooks*, 2012 WL 4890686, at *11.  The plaintiffs now move the court under Fed. R. Civ. P. 59(e) to vacate the judgment and, under Fed. R. Civ. P. 15(a), for leave to file a Proposed Second Amended Complaint that includes new causes of action.[2]  The motions are supported by a Memorandum of Law (Docket No. 106) and the Declaration of Cyrus Mehri (Docket No. 107).

The Proposed Second Amended Complaint differs from the First Amended Complaint in several respects: (1) it adds claims under Title VII of the Civil Rights Act of 1964, as amended,

---

[1] The court's opinion concerning the Motion to Dismiss provides additional details concerning the factual background and claims at issue here.  *Claybrooks v. Am. Broad. Cos., Inc.*, — F. Supp. 2d — , 2012 WL 4890686 (M.D. Tenn. Oct. 15, 2012) [Docket No. 101 in this case] (opinion referred to hereinafter as "*Claybrooks*").  Familiarity with that opinion is assumed.

[2] Claybrooks and Johnson filed an initial version of the Proposed Second Amended Complaint on November 11, 2012.  (*See* Docket No. 105, Attachment No. 1.)  On November 13, 2012, after receiving notices of right to sue (*see* Docket No. 111, Ex. C) from the Equal Employment Opportunity Commission ("EEOC"), they filed an updated version of the Proposed Second Amended Complaint (Docket No. 111), which incorporates and attaches the EEOC right to sue letters.  In their briefing papers, the parties have addressed the updated version of the Proposed Second Amended Complaint.  Therefore, all further references to the "Proposed Second Amended Complaint" will refer to the updated version entered at Docket No. 111.

42 U.S.C. § 2000e-1 *et seq.* ("Title VII"), for intentional discrimination and disparate treatment (*see* Proposed Second Am. Compl. ¶¶ 115-124 (Title VII intentional discrimination) and 125-131 (Title VII disparate treatment)); (2) it adds an additional named plaintiff, Aaron Payne, who participated in a June 28, 2012 casting call for *The Bachelor* in Baltimore, Maryland (¶¶ 18-20 and 87-91); (3) it removes or amends various allegations on which the court previously relied in dismissing the First Amended Complaint[3]; (4) changes the forms of relief requested, particularly as to injunctive relief (*see, e.g.*, *id.* ¶¶ 109 and 128, and at p. 28, Prayer for Relief ¶¶ 3-4); and (5) adds more detail concerning the hiring process for the Shows (*see generally* ¶¶ 48-68). Hereinafter, the court will refer to the existing named plaintiffs, Johnson and Claybrooks, as "the plaintiffs," and will refer to proposed named plaintiff, Aaron Payne, separately.

## STANDARD

---

[3]For example, in *Claybrooks*, the court referenced the following language in Paragraphs 76-78 of the First Amended Complaint:

> According to the plaintiffs, "[s]tudies have shown that television is extremely influential in shaping the way people view one another and themselves." ([First Am. Compl. ¶ 76].) Accordingly, "[t]he exclusion of people of color from *The Bachelor* and *The Bachelorette* sends the message – to whites and racial minorities – that only all-white relationships are desirable and worthy of national attention." (*Id.* at ¶ 77.) From the plaintiffs' perspective, the defendants' communication of this "message" has a deleterious effect on society:
>
>> Defendants have the opportunity to help normalize minority interracial relationships by showcasing them to mainstream America on *The Bachelor* and *The Bachelorette*. Instead, by discriminatorily refusing to cast people of color in the lead roles (as well as in the role of suitor), Defendants play into the perceived racial fears of their audience and perpetuate outdated racial taboos. (*Id.* ¶ 78.)

*Claybrooks*, 2012 WL 4890686, at *2. The Proposed Second Amended Complaint omits most of the cited language.

3

When a party seeks to amend a complaint after an adverse judgment, it faces a heavier burden than for a traditional motion to amend under Fed. R. Civ. P. 15(a). *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010). "Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60." *Id.*; *see also HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 615 (6th Cir. 2012). "In post-judgment motions to amend, as a result, the Rule 15 and Rule 59 inquiries turn on the same factors." *Leisure Caviar*, 616 F.3d at 616 (internal quotation omitted).

Under these circumstances, courts "must consider the competing interest of protecting the finality of judgments and the expeditious termination of litigation." *Id.* at 615-16 (internal quotation and brackets omitted). "If a permissive amendment policy applied after adverse judgments, plaintiffs could use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Id.* at 616 (internal quotation omitted). "That would sidestep the narrow grounds for obtaining post-judgment relief under Rules 59 and 60, make the finality of judgments an interim concept and risk turning Rules 59 and 60 into nullities." *Id.*

Under Rule 59, a court may alter or amend a judgment based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. *Id.* at 615; *GenCorp, Inc. v. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007). However, a motion under Rule 59(e) is not a vehicle for presenting new legal arguments that could have been raised before a judgment was issued. *Roger Miller Music,* 477 F.3d at 395; *see also Leisure Caviar*, 616 F.3d at 616 (movant "cannot use a Rule 59 motion (or for that

4

matter a post-judgment Rule 15 motion) to raise arguments which could, and should, have been made before judgment issued."); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) ("A motion under Rule 59(e) is not an opportunity to reargue a case.").

"A court acts within its discretion in denying a Rule 15 and Rule 59 motion on account of undue delay – including delay resulting from a failure to incorporate previously available evidence, and ought to pay particular attention to the movant's explanation for failure to seek leave to amend prior to the entry of judgment." *Leisure Caviar*, 616 F.3d at 616 (internal brackets, quotation marks, and citations omitted).[4]

## ANALYSIS

The plaintiffs argue that the court should vacate the judgment because (a) the judgment was premised on a clear error of law, and/or (b) the plaintiffs have discovered newly available evidence that justifies re-opening the case. The defendants dispute both points. The defendants also argue that, even if the court were to consider the claims asserted in the Proposed Second

---

[4]In their Response (Docket No. 113 at pp. 4-5), the defendants cite to several opinions by district courts and appellate courts outside this circuit that articulate (1) a five-factor requirement to obtain relief under Rule 59(e) on the basis of newly discovered evidence (*see*, *e.g.*, *Boryan v. United States*, 884 F.2d 767, 771 (4th Cir. 1989)) and (2) a specific standard for demonstrating "clear legal error" for Rule 59 purposes (*see, e.g.*, *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (defining "clear legal error" as "wholesale disregard, misapplication, or failure to recognize controlling precedent")). After conducting its own research, the court has not located any case in which the Sixth Circuit explicitly adopted the *Boryan* test for newly discovered evidence or the *Oto* standard for clear legal error. Therefore, for purposes of the pending motions, the court will apply only the more generalized guidance from the Sixth Circuit concerning either basis for relief under Rule 59(e), such as that expressed in *Roger Miller*, *Leisure Caviar*, *Sault Ste. Marie*, and *GenCorp*. *See, e.g.*, *Roger Miller Music*, 477 F.3d at 395 (stating that, with respect to errors of law, the Rule 59(e) motion must "clearly establish a manifest error of law"); *GenCorp*, 178 F.3d at 834 ("'[N]ewly discovered evidence' . . . must have been previously unavailable.")

5

Amended Complaint, those claims are futile.[5]

I. <u>**Clarification of The Issues Presented**</u>

As an initial matter, the plaintiffs appear to conflate both (a) the clear error inquiry and the newly discovered evidence inquiry, and (b) the court's analysis of allegations in the First Amended Complaint and the court's analysis of allegations in the Proposed Second Amended Complaint. But both of these distinctions are important here.

At times, the plaintiffs seem to suggest that the court should look to the Proposed Second Amended Complaint allegations in determining whether the court committed a clear error of law in dismissing the *First* Amended Complaint. However, the relevant inquiry is whether the court committed a clear legal error in dismissing the case based on the allegations in the then-operative First Amended Complaint.

Also, the plaintiffs argue that they have two forms of "newly available evidence" to present to the court: (1) evidence gleaned from depositions taken on October 2 and 3, 2012 regarding the then-pending motion to transfer, as incorporated into the Proposed Second Amended Complaint; and (2) Title VII claims premised on right to sue letters that the plaintiffs requested after this court granted judgment to the defendants. Whatever the merits of these arguments – which the court addresses in the following section – they could not justify the addition of Aaron Payne as a plaintiff, whose allegations are essentially redundant of those previously asserted by Claybrooks and Johnson in the First Amended Complaint. Nor could they justify the plaintiffs' procedurally improper *post hoc* effort to use the *Claybrooks* opinion as a

---

[5]"A motion for leave to amend may be denied for futility if the court concludes that the pleading as amended could not withstand a motion to dismiss." *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005).

"sounding board" to re-plead their claims by omitting or amending various allegations on which the court previously relied. *See Leisure Caviar*, 616 F.3d at 616. Instead, the "newly available evidence" is conceivably relevant only to the extent that certain Proposed Second Amended Complaint allegations are premised on new evidence.

## II. Clear Error

In reaction to *Claybrooks*, the plaintiffs have asserted a mix of re-argument and new argument. As a general matter, the plaintiffs have essentially taken the incongruous position that this court committed a "clear error of law" in deciding a legal issue that, even by the plaintiffs' own admission, presented a matter of first impression in this country. To the extent plaintiffs argue that the court should have relied on some sources of non-binding precedent over others in reaching its decision, the plaintiffs are simply rearguing positions that the court already considered and rejected. The plaintiffs also continue to argue – now with non-binding caselaw support – that the court should have refrained from deciding this case at the Rule 12 stage, a position that the court specifically addressed and rejected in *Claybrooks*. In these respects, the plaintiffs are simply re-arguing their case, which does not justify relief under Rule 59.

The plaintiffs also argue that the court's reasoning in *Claybrooks*, if applied in other contexts, threatens to "dramatically undermine the nation's civil rights laws" and "would wreak havoc on the federal protections against discrimination." (Docket No. 106 at pp. 6 and 15-16.) Whatever the merits of this policy argument, it does not demonstrate that this court made a clear error of law on the legal issue of first impression presented here.[6]

---

[6]Moreover, as the court explained in *Claybrooks*, there are countervailing free speech policy interests that might be jeopardized by applying § 1981 here. *See, e.g., Claybrooks*, 2012 WL 4890686, at *9 n.15.

7

The plaintiffs further argue that the court should have avoided "pitting" the First Amendment against § 1981 – which the plaintiffs now point out was a "legislative cousin" of the Fourteenth Amendment – and/or that the court should have construed § 1981 so as to avoid a constitutional conflict. Both of these arguments are essentially new contentions that should have been raised before judgment. Regardless, they are without merit. As explained in *Claybrooks*, the court perceived an unavoidable conflict in this case between the First Amendment and a straightforward application of § 1981, which merited consideration at the Rule 12 stage. Furthermore, the plaintiffs' position in the Rule 59 Motion is internally inconsistent: the plaintiffs concede that the First Amendment *would* trump § 1981 with respect to some types of casting decisions for television programs, thereby implicitly acknowledging the constitutional conflict at issue here.[7]

The plaintiffs also argue that First Amendment protections extend only to "artistic" casting decisions but not to casting decisions made purely for "commercial" purposes. They suggest that, after discovery, application of the First Amendment to casting decisions would be conditioned on the true motive for the defendants' casting decisions, which the court or a jury could determine through traditional "motive" inquiries applicable to discrimination claims. The plaintiffs also argue that they simply seek to ensure that minorities are considered on an equal

---

[7]*See Claybrooks*, 2012 WL 4890686, at *8 (construing plaintiffs as arguing "that § 1981 applies to casting decisions in some contexts but not others, apparently based on a court's assessment of whether enforcing § 1981 would actually affect the particular show's message") (emphasis omitted); *see also* Docket No. 106 at p. 15 ("The First Amendment protects Defendants' selections from review under the civil rights laws insofar as they are driven by artistic considerations, such as identifying the candidate who is the most photogenic, articulate, or energetic. If this were a scripted program and the script called for a black or white performer, or a male or female, the First Amendment would protect a decision based on that consideration.").

8

footing with non-minorities in the casting process, without dictating that any particular candidate be chosen.

As an initial matter, the "artistic" versus "commercial" distinction and the recommended "motive" analysis were not squarely raised before judgment and, therefore, have not been properly raised here.[8] Regardless, these positions, taken collectively, continue to epitomize the court's fears about federal courts and juries sitting in judgment on the creative process, regulating producers' casting processes through court-ordered injunctions, and potentially chilling free speech through the threat of civil liability for selecting a television program's cast. The plaintiffs' attempted application of § 1981 in this case is unprecedented. Their asserted grounds for *conditioning* application of the First Amendment to the casting process for television programs are also unprecedented. Given the substantial policy implications, the court was – and remains – wary of finding that § 1981 permits this court to regulate the casting process for *The Bachelor* and *The Bachelorette*.[9]

For these reasons, the court finds that it did not commit a clear error of law in dismissing

---

[8]The plaintiffs previously argued that the court should find that casting decisions involve "conduct" that the First Amendment does not protect unless race plays some unspecified "part in the narrative or artistic vision of the show." (Docket No. 84 at p. 11.) The court rejected that proposed distinction. *See Claybrooks*, 2012 WL 4890686, at *8-*10.

[9]The plaintiffs now suggest that the court erred in focusing on casting "decisions," as opposed to the casting "process". However, the plaintiffs themselves repeatedly referred to "casting" and "casting decisions" in their briefing (*see, e.g.*, Docket No. 84 at p. 6 ("Defendants conflate their conduct, *i.e.*, their *casting decisions*, with the content of their broadcasts") (emphasis added)), a nomenclature that the court at times adopted in *Claybrooks*. *See Claybrooks*, 2012 WL 4890686, at *10 ("The plaintiffs seek to drive an artificial wedge between casting decisions and the end product, which itself is indisputably protected by the First Amendment.") The plaintiffs are essentially arguing semantics. At any rate, the court's concerns in *Claybrooks* extended both to the casting process and to the final casting decisions, to the extent there is even a relevant distinction for First Amendment purposes.

the First Amended Complaint.

> B.     Newly Discovered Evidence

The plaintiffs argue the court should grant the Rule 59 Motion on the basis that the plaintiffs have adduced "newly discovered evidence" that was not available to them before the court issued *Claybrooks*. As discussed above, only certain allegations in the Second Amended complaint are subject to this argument. The court construes the plaintiffs as arguing only that (1) the additional details they discovered concerning the casting process justify reconsideration of the court's previous opinion; and (2) these additional details and/or the EEOC notices of right to sue justify the court's consideration of the Title VII claims asserted in the Proposed Second Amended Complaint.

In point of fact, the plaintiffs have not actually produced new evidence. Instead, they argue that the court should treat certain new allegations in the Proposed Second Amended Complaint – which they claim are based on facts discovered in the October 2012 depositions – and the notices of right to sue requested and received after *Claybrooks* as "evidence." It is not clear to the court whether either qualifies as "evidence" for Rule 59 purposes in the first place.

At any rate, the record demonstrates that plaintiffs were aware of the basic facts supporting their proposed Title VII claims well in advance of the date on which *Claybrooks* issued. The plaintiffs' initial Complaint, filed on April 18, 2012, already incorporated intentional discrimination claims under § 1981 and stated the basic factual premise for their proposed Title VII "disparate impact" claims. Moreover, the plaintiffs' individual EEOC charges, which they filed on or about June 1, 2012, each stated as follows:

> . . . Respondents refuse to seriously consider applicants of color and instead only
> cast people in the role of the Bachelor or Bachelorette who they believe will

> maintain the show's viewership and, by extension, the show's advertising revenue. As the show's 24 Bachelors and Bachelorettes plainly illustrate, this means only hiring white applicants.
>
> Respondents' practice of only hiring white persons for the lead role of the Bachelor and the Bachelorette is furthered by respondents' discriminatory practice of selecting a person for the lead role from the pool of final suitors that appear on *The Bachelor* and *The Bachelorette*. The suitors in both instances are overwhelmingly white, and any suitors of color tend to be eliminated in the early stages. For example, the only African American suitor on the eighth season of *The Bachelorette* was eliminated in the season's first episode.
>
> In addition, the "eligibility criteria" that applicants must meet in order to be considered by Respondents *have a disparate impact on people of color* by causing them to be ineligible at a higher rate than white applicants.

(*See* Docket No. 111, Ex. B (emphasis added); *see also* Docket No. 30, Jt. Mot. to Continue Case Mgmt. Conf., at p. 4 (stating that "Plaintiffs . . . have filed charges of discrimination with the [EEOC] in Nashville and . . . plan to amend the complaint to include Title VII claims.").) Thus, although the plaintiffs may have learned additional details concerning the Shows' casting process in October 2012, the plaintiffs did not "discover" the basis for these claims at that time. To the contrary, they represented months earlier that they intended to bring those claims against the defendants.

As to the EEOC notices, the plaintiffs have not identified any precedent for the notion that, for Rule 59 purposes, EEOC notices issued after judgment can constitute "newly discovered evidence." Even if the court could consider the *right* to assert Title VII claims as "newly discovered evidence", the plaintiffs have not justified their delay in asserting the proposed Title VII claims. The defendants filed their Motion to Dismiss the First Amended Complaint on June 28, 2012, placing the plaintiffs on notice that their entire case was subject to potential dismissal. The motion was fully briefed by August 17, 2012, and the court decided the motion and granted

11

judgment to the defendants on October 15, 2012. During this time frame, the plaintiffs did not ask the EEOC to issue notices of right to sue,[10] nor did the plaintiffs request relief from the court to delay consideration of the Motion to Dismiss until they exhausted their administrative remedies with respect to the Title VII claims. Instead, they held the Title VII claims in their back pocket until the court decided the Motion to Dismiss. In the interests of judicial economy and fairness, the plaintiffs are not entitled to re-plead their claims under these circumstances.

For these reasons, the court will not vacate its prior judgment and, therefore, need not reach the merits of the Title VII claims asserted in the Proposed Second Amended Complaint.[11]

## CONCLUSION

For the reasons stated herein, the plaintiffs' Rule 59 Motion and the plaintiffs' Rule 15 Motion will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[10] If a claimant requests a notice of right to sue from the EEOC within 180 days of filing a discrimination charge, the EEOC may issue such a notice if it determines it will be unable to complete its administrative processing of the charge within the 180-day time frame. *See* 29 C.F.R. § 1601.28(a).

[11] Even if the court were to reach the merits of those claims as alleged in the Proposed Second Amended Complaint, they would fail for substantially the same reasons as the § 1981 claims. Furthermore, subjecting television producers to potential civil liability under a disparate impact theory for casting decisions that were not racially motivated – but that simply had a disparate impact on the racial makeup of the cast for a particular show – would implicate additional policy concerns.